UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )
                                   )               Case No.
     vs.                           )         CR 16-00270 SJO
                                   )
CURTIS AUDUN LARSSEN,              )
     aka "Curtis Audun Telesio,"   )
                                   )
                 Defendant.        )
_____)

REPORTER'S TRANSCRIPT OF
SENTENCING
MONDAY, JULY 31, 2017
9:35 A.M.
LOS ANGELES, CALIFORNIA

CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA  90012-4565
(213) 894-3539

1                     **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4      SANDRA R. BROWN
     Acting United States Attorney
5      BY:  JENNIFER Y. CHOU
         Assistant United States Attorney
6      United States Courthouse
     312 North Spring Street
7      Los Angeles, California 90012
     (213) 894-6482

8

9   **FOR THE DEFENDANT:**

10     HILARY LEE POTASHNER
     Federal Public Defender
11     BY:  NADINE C. HETTLE
        Deputy Federal Public Defender
12     Central District of California
     321 East Second Street
13     Los Angeles, California 90012
     (213) 894-4790

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    **LOS ANGELES, CALIFORNIA; MONDAY, JULY 31, 2017**

2         **9:35 A.M.**

3          --oOo--

4    THE COURTROOM DEPUTY:  Calling Item No. 4:

5 Case number CR 16-00270 SJO; United States of America versus

6 Curtis Audun Larssen.

7   Counsel, please state your appearances.

8    MS. CHOU:  Good morning, Your Honor.  Jennifer Chou

9 on behalf of the United States.  With me present at counsel

10 table is Special Agent Shawn Lenny.  I also do want to note

11 present in the courtroom is Probation Officer Melinda Nusbaum,

12 who prepared the PSR, and Dolores Perez, victim witness

13 coordinator, is out in the hallway trying to get some

14 last-minute information on restitution.  And last, but not

15 least, the victim, who I'd like to refer to as initials S.H.,

16 is also present.

17    MS. HETTLE:  Good morning, Your Honor.  Nadine

18 Hettle on behalf of Curtis Audun Larssen, who is present.  Also

19 present in the audience is his mother, Gloria Telesio.

20   Your Honor, we would like to begin, there was a later

21 filing for restitution.  We do not oppose the restitution

22 request.  We were informed this morning that the person I

23 believe known as S.R., who's identified as this person who had

24 the sexual act with victim S.H., has been charged, I don't know

25 what district, where the district of Seattle is located,

4

```
 1   Your Honor.  So we would ask the Court to do its best to make
 2   that joint and several with that restitution.  I don't think we
 3   have a case number at this point.
 4           THE COURT:  I will propose the language, and if we
 5   have an agreement or stipulation with counsel for the defendant
 6   and the Government, the Court is likely to approve it, so --
 7           MS. CHOU:  Your Honor, I think the discussion
 8   regarding restitution, we are getting beyond ourselves.  That
 9   case is still pending, so I think it makes the most sense for
10   the Court not to order any joint and several restitution in
11   regard to victim S.H.
12       If and when the defendant in the Western District of
13   Washington, I guess, where Seattle is located, if and when that
14   person is convicted and the Court there orders joint and
15   several restitution liability, then I would notify the Court
16   here to update and modify the restitution order to reflect
17   joint and several liability.
18           THE COURT:  Yes, thank you.
19           MS. CHOU:  But again, I think we are getting a
20   little ahead of ourselves.
21           MS. HETTLE:  I agree, Your Honor, we are getting a
22   little ahead of our thoughts.  I will address that later,
23   Your Honor.
24           THE COURT:  Okay.  Thank you.
25       So the matter is here for purposes of sentencing.
```

1        Mr. Larssen, there's been much filed in this case, many

2   pleadings filed and documents.

3        The Court has reviewed various documents and pleadings

4   regarding the case, including the second amended plea agreement

5   for the defendant, Mr. Larssen.  Previously it was an

6   11(c)(1)(C) plea, and then that was rejected by the Court.  And

7   thereafter, the parties engaged in new plea negotiations or

8   discussions, and a second amended plea agreement was filed.

9   And then the defendant entered a plea of guilty pursuant to

10  that written plea agreement.

11       The Court has reviewed the confidential letter to the

12  Court from the probation officer.  The Court has received two

13  letters from the probation officer, two recent letters

14  regarding recommendation:  one dated July 5th, 2017, and a

15  second July 19th, 2017.  And I would just underscore that

16  there's nothing contained in those confidential letter

17  recommendations to the Court that is not fully discussed in the

18  presentence investigation report.

19       The Court has reviewed the initial presentence

20  investigation report, the first addendum to the presentence

21  investigation report, the second addendum to the presentence

22  investigation report, the revised report that was revised on

23  May 12th.  The initial report was prepared on January 25th,

24  2017 and then revised May 12th.

25       The Court has reviewed the most recently revised

1    presentence investigation report, which is July 5th, 2017.  The

2    Court has reviewed the curriculum vitae and the report of

3    Dr. Phillips.  The Court has reviewed the defendant's

4    supplemental pleading regarding sentencing, which included the

5    evaluation and assessment of the defendant as Exhibit A to the

6    supplemental pleading, and that was prepared by Dr. Phillips,

7    J.D., Ph.D., Dr. Phillips.

8        The Court has reviewed the Government's supplemental

9    pleading regarding sentencing, and we have that pleading filed

10   July 17th, 2017, with the Exhibit H attached concerning the

11   proposed order of restitution, and then the supplemental

12   sentencing information dated July 20th, 2017.

13       The Government previously, at the initial sentencing

14   hearing, offered numerous information reports, statements by

15   the various victims in the case.  And the Court has not read

16   each and every page of those numerous exhibits, but I have, I

17   think, thoroughly reviewed the pleadings regarding the

18   statements made by some of the other victims that were victims

19   of the child pornography.

20           MS. HETTLE:  Has Your Honor reviewed, excuse me, our

21   initial position paper, Your Honor?

22           THE COURT:  Yes, I have, and I do have a question

23   regarding the initial pleading and the current pleading.  So in

24   the initial pleading, and by "initial," I'm referring to --

25   let's see if I have a document number.

1        I do not have a document number here.  This was the May

2   18th, 2017, and there was a recommendation of 135 months.  And

3   then in the July 2017 pleading, the recommendation is 120

4   months.

5            MS. HETTLE:  We were under a binding agreement,

6   Your Honor.  So we are recommending -- we are requesting

7   Your Honor to consider a 10-year sentence.

8            THE COURT:  So we will start with the various -- we

9   will start with the PSRs and the pleadings here.

10       Mr. Larssen, have you had an opportunity to review the

11  PSRs that have been filed in this case and the addendums

12  thereto?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  I placed the numbers on the record, so I

15  just want to make sure you were given the opportunity to review

16  all of those documents or pleadings.

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  And then there's numerous pleadings

19  filed by the Government, numerous pleadings filed by your

20  counsel, and then statements by victims in the case.

21       Have you been able to review those documents also?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Do you feel that you've had sufficient

24  opportunity and time to review all of these pleadings and

25  documents?

```
 1              THE DEFENDANT:  Yes, Your Honor.
 2              THE COURT:  Do you feel that you've had sufficient
 3    time to discuss the contents of all of these documents and
 4    pleadings with your attorney?
 5              THE DEFENDANT:  Yes, Your Honor.
 6              THE COURT:  And then do you have any questions at
 7    this time of the Court or your counsel regarding any of these
 8    documents, sir?
 9              THE DEFENDANT:  No, sir.
10              THE COURT:  So just to provide some context here for
11    purposes of the sentencing, the defendant pled guilty to
12    Count One of the single-count first superseding information.
13    Count One charged the defendant from March 2011 through March
14    27, 2014, he used a facility of interstate commerce to induce a
15    minor to engage in criminal sexual activity.
16         And pursuant to a second amended plea agreement, he
17    entered that plea, and the parties stipulated to a factual
18    basis and then agreed to a base level of 32, 2-level increase
19    pursuant to guideline 2G2.1(b)(1)(B) for victims between the
20    ages of 12 and 16, a 2-level increase for sexual contact that's
21    pursuant to 2G2.1(b)(2), 2-level increase for misrepresentation
22    of identity, use of computer.  And then the parties agree not
23    to argue that additional specific offense characteristics
24    adjustments or departures be imposed.  And then the parties may
25    argue for a variance outside the guidelines based on 3553.
```

1    The Government agreed to dismiss the underlying

2  indictment, to recommend a 3-level reduction for acceptance,

3  not further criminally prosecute Mr. Larssen for violations of

4  Title 18 2422 and Title 18 2551, and 2252(a) and recommend that

5  Mr. Larssen be sentenced to a term of no more than 168 months,

6  or 14 years.

7    And then importantly, Mr. Larssen agreed to -- agreed not

8  to oppose an imposition of lifetime supervised release pursuant

9  to the conditions articulated in the plea agreement, and then

10 he also agreed to pay full restitution to the victims.

11    There was a side agreement with the prosecutorial office

12 in King County, Washington, and they have agreed not to pursue

13 any state violations or prosecutions based on the conduct

14 arising out of the allegations contained in the indictment --

15 I'm sorry, the first superseding information and then also the

16 allegations contained in the plea agreement.

17    There are a couple of pretrial issues that may complicate

18 the sentencing, and that is when the defendant was on pretrial

19 release, he -- in an unannounced home inspection of his

20 residence, it was uncovered that he had three thumb drives and

21 a SIM card adapter, which the pretrial services officer

22 confiscated for review.

23    And then it appeared that when it was reviewed, that it

24 contained questionable child pornography, as one of the persons

25 depicted appeared to be a person under the age of 18.  However,

1    I'm not sure that was -- it was a final determination as to the

2    age of the person that's referred to there.  In any event, he

3    was in possession of material that he should not have been in

4    possession of.

5        The offense conduct is detailed in the presentence

6    investigation report.  Of particular import is that the

7    defendant commenced an online relationship with S.H. back in

8    2011, and at the time the relationship began, the defendant was

9    28 years old and S.H. was no older than 13 years old.  The

10   defendant was aware of the age of S.H.

11       And the defendant was residing in Los Angeles; S.H. in the

12   state of Washington, Seattle.  And over the next three years,

13   the defendant communicated with S.H. in various ways, including

14   e-mail, online instant messaging, video chat via Microsoft

15   Messenger and then Skype and telephone.

16       And the conduct is extremely detailed.  It's covered in

17   the probation -- I'm sorry, in the presentence investigation

18   report, but the defendant, just to capitalize, encouraged S.H.

19   to engage in numerous sexual activity in front of the webcam so

20   that Mr. Larssen could watch.  He encouraged her to meet other

21   persons -- or male persons, adults, to engage in sexual

22   activity, and the conduct continued for numerous -- or a number

23   of months and years.  And it would appear to the Court that the

24   defendant in many ways caused significant long-term

25   psychological, emotional injury to S.H. based on all of this

1    activity.

2        Separate and apart from the activity with S.H., what

3    complicates the matter even more is that in 2014, pursuant to a

4    search warrant, law enforcement seized on Mr. Larssen's

5    computers what turned out to be 470 videos and 2 image files

6    containing child pornography.  The videos contained minors,

7    whose ages ranged from 16 or 17 years old, engaged in sexual

8    conduct.

9        What's depicted on the videos is detailed in paragraph 21

10   of the PSR, and it appears that the videos are depicting acts

11   wherein the minors are in -- separate and apart from the sexual

12   activity that's occurring, the minors are in many ways being

13   tortured.  So the Court has reviewed all of this.

14       There are some issues involving Mr. Larssen separate and

15   apart from all of his conduct that are a bit perplexing.  In

16   reference to paragraph 27, he admitted to having certain

17   conduct with -- engaging in certain conduct with the daughter

18   of an ex-girlfriend, and then he talked about meeting other

19   minors ages 14 through 17 through a website called

20   teenspot.com.  And then later on, he appears to have recanted

21   or changed his claims.  And the daughter of the person who he

22   identified initially to investigators, the mother was

23   contacted, and she claims that there was no inappropriate

24   conduct, but it's a bit strange that he would be admitting to

25   all of this and then changing it.

1        Separate and apart from all of this, the defendant has

2    some significant emotional underlying issues, and he appeared

3    at one time to be possibly suicidal.  So the Court has reviewed

4    all of the conduct, and the impact of that conduct, I think, is

5    graphically depicted in the statements of the victims that have

6    been brought to the attention of the Court.  And the victims

7    have been significantly impacted by what happened to them in

8    these pornography videos and then how that continues to harm

9    them when others view it.

10        So in reference to the defendant, the defendant's

11    upbringing was significantly compromised by a father who, it

12    looks like, caused some emotional damage to the defendant, and

13    the Court has considered some of the emotional trauma that the

14    defendant has suffered as a young boy growing up in a family,

15    mother and father that were separated, and then being exposed

16    to certain sexual activity occurring at his father's home when

17    he was a child, and then berated by his father.  So we have all

18    of that.

19        So there's much aggravating factors here that should be

20    discussed or explained, and then we certainly have some

21    mitigating issues here.

22        And so I'll start with, I guess, Ms. Hettle.

23            MS. HETTLE:  Thank you, Your Honor.

24        I just wanted to clarify, I was concerned about the

25    Court's characterization of the statement in paragraph 27 of

1   the presentence report regarding Mr. Larssen's alleged

2   statement concerning -- we will call her K., which is the

3   daughter of the ex-girlfriend.

4            THE COURT:  Well, is it an alleged statement?

5   Because the reason I read it, he made the statement, and there

6   was an investigation as to what he was telling the

7   investigators was true and correct.  And they went out and

8   determined that it may not -- well, they got a different

9   story, different information from the mother and apparently the

10  child.

11           MS. HETTLE:  Your Honor, I would point out that the

12  statement taken on July 24th was not recorded --

13           THE COURT:  Yes.

14           MS. HETTLE:  -- because it was part of the

15  polygraph, which is the FBI's practice not to record the

16  polygraph, but, Your Honor, I think that that statement is open

17  to interpretation about how the FBI agent chose to interpret

18  that.

19           THE COURT:  Well, we can parse it, if you want to.

20  "Larssen stated that two years ago, while dating his

21  ex-girlfriend K., he had become sexually aroused by her

22  eight-year-old daughter L.  Larssen said he would invite L. to

23  sit on his lap, which caused Larssen to get an erection.

24  Larssen also said he had sexual fantasies about L. during

25  sexual intercourse with K.  Defendant said K. was extremely

```
 1    vigilant with L., and, therefore, Larssen was never alone with
 2    L."
 3         Those are pretty explicit, affirmative-type statements.
 4    What are you saying?
 5              MS. HETTLE:  Well, Your Honor, you are assuming that
 6    was indeed the exact statement that was made.
 7              THE COURT:  I'm not assuming that, but I'm assuming
 8    that the substance is fundamentally accurate.
 9              MS. HETTLE:  That -- Your Honor, I wouldn't assume
10    that, and that also could be somebody admitting to something
11    that happened after the fact and that there was no interaction
12    with the child.  I would point out to you that he was not in
13    contact with K.'s mother for several years, and when the FBI
14    came and talked to her, she had not been in contact with
15    Mr. Larssen.  There's no indication that they had any
16    discussion about this investigation.
17         She reported that her child was not ever alone with him.
18    The child did not state that she was ever touched by him or
19    abused by him.  I think the way that the Court was describing
20    this seemed to suggest that he, perhaps, had interaction with
21    the mother to have her back off, and that's not the case.  They
22    have not been in touch with each other that whole time.
23              THE COURT:  Ms. Hettle, if I conveyed that to you,
24    then I conveyed the wrong message.  The way I view this is that
25    he made the statements to the FBI.  The FBI made an effort to
```

1   try to determine the veracity of his statement.  What they

2   found out didn't support his claims, so I'm not assuming that

3   the conduct occurred.

4              MS. HETTLE:  Very well.

5              THE COURT:  But I am assuming that he made the

6   statement.

7              MS. HETTLE:  Your Honor, as to the image that was

8   found pretrial, we were given no specific information about

9   that.  There was no date that was provided in connection with

10  that file to suggest when it was acquired.  I will point out to

11  you that he was living with his mother at the time, and she did

12  have a computer and was using her computer use -- I'm sorry,

13  was using her computer.  That could have been an item that was

14  left behind.

15      There was no further information provided by pretrial to

16  the defense about that image, which, at worst, appears to be an

17  age-difficult image, meaning hard to determine looking at it

18  whether this is an underage person.

19              THE COURT:  I have to -- I think at this point I

20  have to give all -- resolve all doubt in favor of the

21  defendant.  So they were not able to determine the age of the

22  person on that video, and so I'm assuming that the person

23  depicted was not a child.  That being said, I would think that

24  when one is on pretrial release, they are on their best

25  behavior and making efforts to not have any type of materials

1    in their possession that could in any way compromise their

2    pretrial release, and that is the nature of the Court's

3    concern.

4           MS. HETTLE:  I understand, Your Honor.  And that

5    appears to be one image.  It appears to be on a hard drive

6    where there could be mistakes made as to whether those

7    drives -- not hard drives, excuse me, on a thumb drive, which

8    could easily get out of somebody's control.  And there's no

9    information as to when that image was acquired, Your Honor.

10   So --

11          THE COURT:  Yeah, more importantly are the 470

12   videos --

13          MS. HETTLE:  Yes.

14          THE COURT:  -- that he possessed with the 2 image

15   files containing child pornography.  And if you look at what

16   was depicted on those videos in paragraph 21(a), the minor, a

17   female, is completely naked and wearing only a mask.  And in

18   the beginning of the video, the minor female is seen orally

19   copulating the adult male while he is sitting on a chair, and

20   the adult male is heard saying -- and then it goes on.  Of

21   particular import is that the minor child appears to be gasping

22   and crying at the time.

23          MS. HETTLE:  That is correct, Your Honor.  And this

24   is a series of videos --

25          THE COURT:  Yes.

1          MS. HETTLE:  -- that appear quite often in these

2   child pornography cases.  I am not saying it is not a horrible

3   image or horrible video.  All I'm saying, that is a series

4   that's been recognized by NCMEC, and it has appeared in several

5   cases that I have been assigned to, Your Honor.

6       If I may begin, Your Honor, in terms of this case, we have

7   provided a report by Dr. Phillips that shows that Mr. Larssen

8   was subjected not just to emotional trauma, Your Honor; what he

9   was subjected to as a child was abuse.  It is sexual abuse; it

10  is emotional abuse.  It is abuse just as significant as if he

11  were sexually molested.

12      He was, at a preteen age, Your Honor, subjected to

13  watching hardcore pornography because his father believed that

14  would make him a man.  He was sent messages by his father that

15  this is the way that a man must behave.  He saw messages in his

16  parents' marriage where his father emotionally abused his

17  mother.  He identified with his mother in the struggle between

18  his parents and tried to protect her.

19      He never got help for this childhood abuse because he

20  thought he couldn't tell his mother because she was dealing

21  with enough in her life, separating from the father and trying

22  to raise her children.  He did not want to burden her with

23  this.  He tuned it out, but the constant message was "You're a

24  fag," "You're a sissy," "You're not man."

25          As Dr. Phillips shows, that sublimated in his

```
 1    subconscious.  Just like other victims of childhood sexual
 2    abuse sometimes do, we see the victim in this case, S.H.,
 3    saying in her letter to the Court that her mother asked her why
 4    she engages in some of the sexual behavior that she does.  She
 5    acts out sexually.  That's why she was on Teen Spot.  That's
 6    where they met online.
 7         Sexual victims often act out because of sexual abuse.
 8    Mr. Larssen pushed that down, pushed that abuse down, never
 9    dealt with it, didn't feel safe.  And his mother is a dear
10    woman who loves him immensely, Your Honor, but she was
11    struggling with alcoholism.  He took care of her.  He managed
12    her emotionally.  He did not want to add anything more to that.
13    He did not want to anger her.
14         He took care of her emotionally instead of taking care of
15    himself, and at a time when his sexual being was developing,
16    the message to him was that "You are a man.  You degrade women
17    with your remarks."  That's what his father did to his mother.
18    "You treat them as sex objects.  They're good for nothing but
19    sexual exploitation."  That's the message, "If you are a man,
20    if you are a successful man, this is what you really feel," and
21    his intellect told him that's not true.
22         The abuse manifested itself with a brother and sister as
23    well.  His sister is a drug addict.  Instead of feeling her
24    feelings, instead of dealing with her emotions, she fades out
25    with drugs.  She wipes them out with drugs.  The same thing
```

1    with the brother, but he turned violent, as you can see with

2    the incident with a gun.  And called him a "pussy" and a "fag"

3    and "You're not a man," and these are the messages that my

4    client grew up with.

5        This is not emotional trauma.  This is emotional abuse.

6    This is sexual abuse in a very indirect way, in a way that is

7    so sneaky, that if my client had been sexually molested by his

8    father, he would have thought that was something he should have

9    gotten help for if his father had sex with him, but this more

10   subtle, more corrosive, more eroding of his whole entire being

11   and self-esteem, he thought this was something he should just

12   man up, suck up and keep going.

13       This is a person who has been traumatized severely, and

14   just like the victim who got on Teen Spot and talked sex to men

15   because she was sexualized, and she talks about that, and it is

16   tragic reading the transcripts, it is tragic, Your Honor.  And

17   I am not blaming her, and please don't take my words --

18       And, Ms. H., please don't take my words in that way.

19       But this is what victims of sexual abuse do.  The fact

20   that she did it while she was 13 and he did it later in his

21   20s, it's still the same thing, Your Honor.

22       So what do we have here that says this person isn't going

23   to get out and do this again, that he isn't going to sexually

24   abuse people?  One hopeful thing is that he doesn't act

25   physically directly.  There was a very intensive investigation

1    here, including of the child, of his ex-girlfriend, and there

2    is no sign that he actually physically touched somebody.  He

3    does it in this realm where there is one step of removal.

4         Is this -- does it make her abuse less traumatic for her?

5    It doesn't, and I'm not arguing this to make that point.  I'm

6    arguing, Your Honor, to talk about the personal characteristics

7    of my client.  He was a late bloomer sexually because of lack

8    of confidence.  He didn't have sex with a girl until 18.  He

9    has had few sexual partners in his life, although he's had

10   relationships.

11        This is good because this is a person who can relate to

12   people, relate to people of the opposite sex, and there is hope

13   for a healthy relationship here.  Why is this important?

14   Because we know that if people have had no adult relationships,

15   they are exclusively fixated on children.  That's a bad sign.

16   We don't have that here.

17        And also, we have Dr. Phillips's, on page 10, he indicates

18   that he believes that the defendant's statement is credible,

19   that he hasn't had sexual contact with a child.  I think that

20   Dr. Phillips has written a very responsible report here,

21   Your Honor, and does not pontificate in areas where no one here

22   really knows.  But he did indicate here in the second

23   paragraph:  Nothing suggests that these regressive feelings

24   expressed themselves in other than obsessive accumulation of

25   pornography, Internet sexual behavior --

1            THE REPORTER:  Slow down, please.  Start over.

2            THE COURT:  Slow down.

3            MS. HETTLE:  In fact, given the complete absence of

4    allegations or any acts of physical contact with minors,

5    Mr. Larssen's susceptibility to lifetime guilt and shame and

6    his reported history of contact with children, his denial of

7    actual physical sexual contact with a minor are credible and

8    consistent with his overall psychological composition.

9         Your Honor, page 10, Your Honor -- his fantasies are sick,

10   no doubt about it.  They are very graphic, and we see that in

11   what has been provided of his chats.  They are akin to, I can

12   say, nothing less than the crap that his father showed him of

13   hardcore pornography.  This person, though, has kept it on the

14   Internet wrap, from all that we can see here, and that requires

15   somebody to be on the Internet.

16        We are not only asking a 10-year sentence here; it's a

17   lifetime period of supervised release, Your Honor, a lifetime

18   that this Court has power over him, a lifetime of Internet

19   patrolling, a lifetime of a threat of dragging him back in

20   court should he do anything near this, a lifetime of random

21   searches, a lifetime of restriction on residence, a lifetime of

22   a scarlet letter on him, Your Honor, for any relationship he

23   gets in, a lifetime of a probation officer having contact with

24   his sexual partner, with his wife, with whatever, and

25   overseeing that relationship, a lifetime, Your Honor.

1        And that is important because it mitigates some of the

2   concern here about him living in the world.  If his access to

3   the Internet is patrolled, it directly affects this kind of

4   conduct, and we haven't seen conduct of direct contact.  We

5   have the statements that the Court was concerned about earlier

6   regarding K., are in the realm of fantasy, Your Honor.  The

7   mother of that child says nothing happened.  The child says

8   nothing happened.

9        And when I say "fantasy," I don't mean to demean the

10  seriousness of the conduct, Your Honor, because he needs help,

11  and he needs therapy for these fantasies.  He is ashamed of his

12  conduct.  He is ashamed of these thoughts.  He is ashamed of

13  this part of himself.  He is ashamed and shocked because, in

14  his own words to me, he has become his father, the person that

15  abused his mother, the only person in his life who has ever

16  been consistent in taking care of him, her abuser.  He feels

17  like he's become that person.

18       And I think, Your Honor, that is a genuine

19  characterization of how he feels.  That's also very evident in

20  Dr. Phillips's report to the Court.  He has expressed it in

21  there several times.  He has become what he has despised,

22  Your Honor.  That, when we talk about the history of this

23  person, is serious trauma, Your Honor.

24       Just because it's not -- we sit in this courtroom here,

25  hear horrible stories every day about people's lives, but

1    trauma is trauma, Your Honor, and we all take trauma on a

2    personal level.  And just because Child Protective Services

3    were not called in on his life doesn't mean that this didn't

4    harm him, Your Honor.  And I would suggest that this Court look

5    at this as deeper than just emotional trauma.  It is sexual

6    abuse, Your Honor.

7         In terms of the nature of the offense, Your Honor, this is

8    a difficult case.  It is not a straight pornography case.  It

9    is not a straight inducement case.  There are plenty of

10   inducement cases where we have people actually having the will

11   to have sex with people, where we have to worry about whether

12   that individual will go and will sexually abuse a neighbor's

13   child.  He does not appear in that realm, and in that sense he

14   is different, Your Honor.

15        That is not to say that abuse did not occur here.  It is

16   not to say that Ms. H. did not suffer because of this conduct.

17   It is a complicated -- it is more complex in that he went to

18   this place, Teen Spot, or this chat room.  She was there; he

19   started talking to her.  There's this assumption that goes on

20   on the Internet that this world is in and of itself, which, you

21   know, I really think as a society, we have to bring back

22   because harm does happen.  The words that we use do make an

23   impact on people.

24        So both of these people had put themselves in this place

25   in the Internet.  And he pretended to be somebody other than

1   who he was.  This went on for three years.  There's the initial

2   concerning conduct of where it looked like he wanted to meet

3   up.  It didn't happen, Your Honor, and he had plenty of time to

4   arrange that if that's what he was going to do.  It didn't

5   happen.

6        And again, I go back to his history, Your Honor, of

7   somebody who is a late bloomer, somebody who has had more

8   long-term girlfriends over time.  This is not a person who is

9   an aggressive person sexually or, again, goes face to face.

10  His history doesn't suggest that.  It's on the Internet.

11       This is serious, no doubt, but it's something that could

12  be mediated by this Court.  And we must remember that the least

13  restrictive means sort of is what we are doing here, sufficient

14  but not greater than necessary, Your Honor, taking into account

15  everybody here, Your Honor, Ms. H., as well as Mr. Larssen.

16       There was production of an image, Your Honor, but it

17  wasn't production as we know it, in this case -- or the

18  standard type of production in these cases where somebody is

19  taking pictures of the child or having sex with them and taking

20  pictures and then spurring these images all throughout the

21  Internet.  This image was taken by the victim and sent by the

22  victim.  It is a little bit different.  So this is not your

23  classic case, Your Honor, in any way, shape or form.  And I

24  would submit, Your Honor, the conduct here shows less danger

25  than the average person charged with this.

1    A 10-year sentence, Your Honor is saying this is serious

2 and hopefully does address to the victim that society takes his

3 conduct seriously.  For Mr. Larssen, the impact, Your Honor,

4 he's 34 years old; he would be, in 10 years, 44, all this time

5 where somebody is building a career, building a family, all of

6 this is going to be taken from him.

7    I think 10 years back in my life, I was starting to have

8 children, and now I'm starting to look at retirement.  10 years

9 is a huge chunk of his life, Your Honor.  It's a little less

10 than one third of the time he has already spent on this earth.

11 And when we compare this against state cases, Your Honor, even

12 in a touching offense in a state case, there's no way that

13 somebody would get this amount of time with this kind of

14 conduct.

15    This is a significant punishment, Your Honor.  He has

16 never been in trouble before.  And we often see, even in cases

17 where somebody's criminal history is 1, where they seem to have

18 run-ins with the law, where touching offenses happened with a

19 child, nothing, Your Honor, no arrest, nothing.  He is a

20 first-time offender.

21    He is a victim, Your Honor, of childhood abuse.  He acted

22 out sexually on repressed thoughts.  He needs help for that,

23 Your Honor.  He needs counseling.  He will get that on

24 supervision, but, Your Honor, I ask you to take this into

25 account, take lack of actual physical contact with any minor

```
 1    when sentencing Mr. Larssen.
 2        Also take into context his relationship with his mother.
 3    She will be very elderly by the time he gets out of custody, if
 4    she lives that long.  10 years, Your Honor, is a long, long
 5    time.
 6              THE COURT:  Have you concluded?
 7              MS. HETTLE:  I have, Your Honor.
 8              THE COURT:  Thank you.
 9        Look, I have no doubt that there is a relationship between
10    being abused and then becoming an abuser, and maybe in
11    Mr. Larssen's case there was a cause and effect, so his father
12    may have caused him to become an abuser.  Certainly his father
13    was extremely abusive, misogynistic father by any measure, and
14    I recognize and I understand that, but at some point in time
15    the conduct has to be stopped, and the sentence has to reflect
16    the harm and damage caused by this defendant.  And in this
17    particular case, I would think there is significant harm and
18    damage caused to the victim here, and that has to be taken into
19    consideration.
20        Let me just turn it over to Ms. Chou, if you have any
21    comments, any additional argument.  You are one of the experts
22    here in these cases, so I'm open to hear from you.
23              MS. CHOU:  Yes, Your Honor.  Well, can I just get
24    some of the other logistic things out of the way?
25              THE COURT:  Yes.
```

```
 1              MS. CHOU:  I have a victim's statement.

 2              THE COURT:  Yes.

 3              MS. CHOU:  All right.  There are three

 4  victim-related issues that I just wanted to put on the record.

 5  The first is that the victims have asked the Government to

 6  request that the Court state in the judgment order that the

 7  following people are victims of the defendant's criminal

 8  conduct.  I am reading from page 5 of the Government's

 9  supplemental sentencing position.

10              THE COURT:  Well, let me find it.

11              MS. CHOU:  I'm sorry, Your Honor.  It's actually

12  page -- no, it's page 5.

13              THE COURT:  I'm looking at the Government's

14  supplemental sentencing.

15              MS. CHOU:  Document 73.

16              THE COURT:  I don't -- let's see.

17              MS. CHOU:  The one that was filed not under seal.

18              THE COURT:  Yes, I have Document Number 73.  There

19  is a stipulation.

20              MS. CHOU:  The exhibit is a stipulation.  Actually,

21  what I wanted to put on the record is at page 5 of the

22  position.

23              THE COURT:  Okay.  Let me find page 5.

24          I have it right here.  Okay.

25              MS. CHOU:  And that on behalf of the victims, they
```

1    have asked the Government, again, to ask the Court to state in

2    the judgment order that the following are victims of the

3    defendant's offense:  Victim H., from the "Valley Girl"

4    series --

5              THE COURT:  Where are you reading from?  Page 5,

6    line?

7              MS. CHOU:  Sorry, Your Honor.  This is line 20 in

8    the restitution and victim impact statements, and these are the

9    victims from the child pornography series that were identified

10   by NCMEC, the National Center for Missing and Exploited

11   Children.

12             THE COURT:  So page 5, line 20, through line what?

13             MS. CHOU:  27.

14             THE COURT:  27?

15             MS. CHOU:  Yes.  So just for the record, Your Honor,

16   that the following people are victims of the defendant's

17   offense:  victim H. from the "Balletgirls" series; victim K.Y.

18   from the "Dalmatians" series; victim Sierra from the "Jan

19   Socks" series; victim Sarah from the "Marineland" series;

20   victim Pia from the "Sweet Sugar" series; and the victims from

21   the "Tara," "Jenny," "Hawaiian Purple" and "Vicky" series.  And

22   those are not their real names, Your Honor.  And I would also

23   ask that the Court find that victim S.H. is also a victim of

24   the defendant's offense.

25        Second, I would like to read into the record a letter that

1    was submitted as a part of Exhibit C that was filed under seal

2    with the Government's first sentencing position, and this is a

3    letter from the husband of victim -- the victim from the

4    "Vicky" series.  And their counsel has asked that I read this

5    into the record at sentencing.

6         "In my home every day is riddled with challenges, each

7    with its own challenges that plague the mind and seal a broken

8    heart toward callous obscurity.  We chase the ghosts of the

9    past and battle the phantoms that fight to keep that darkness

10   circulating.  Unfortunately, time can't heal all things.  This

11   is especially true as we face the persecution of a wound opened

12   again and again for the pleasure of strangers.

13        "You have more impact than you know.  It is our desire not

14   only that justice be served, but that true change would be

15   enacted through the enlightenment of this unfortunate

16   situation.  I assure you that child pornography is not a

17   victimless crime.  These are not the recorded tales of mutual

18   love, but of the violation of a child's trust and the savage

19   destruction of their childhood resulting in a fractured and

20   unforgiving adulthood.

21        "There are many effects of child pornography, some more

22   extreme than others.  My wife suffers from dissociative

23   personality disorder, which means her memories shut off to

24   protect her from triggers to perceived trauma.  Some of these

25   triggers, some as simple as a word, have been discovered, but

1   as you might guess, there are still new scenarios that are

2   encountered all the time.  We are still unable to celebrate her

3   birthday because of events that were beyond her control, and

4   their effects still linger today.

5       "Our family must guard our personalities very closely when

6   using social media or other Internet accounts.  We have been

7   plagued by stalker after stalker calling themselves 'fans' and

8   being oblivious to the damage they are causing a survivor of

9   one of the most traumatic events a human can experience.

10       "My aim is not to hurt you with these words.  I pray that

11  you were unaware of the damage you have caused.  My greatest

12  hope is that we can meet with the realization that child

13  pornography must stop.  There are too many little girls with

14  broken hearts walking around feeling empty because someone

15  wanted what was not theirs and then took it by force and

16  coercion.  You are a participant in that crime.  You became

17  part of the problem.

18       "I am asking you now to help us make amends for your sins

19  and the sins of many.  Please speak out against this act.

20  Impact the world around you for good and turn away from what I

21  can only describe as a great evil in our midst.  This evil

22  creeps into the lives of otherwise good men and begins to

23  corrupt the heart.

24       "I am imperfect, and so how could I expect you to be?  You

25  have already been forgiven, and I want nothing more than your

1    full restoration without the mar of your past habits and

2    appetites.  Unfortunately, that means consequences, those that

3    challenge you and place you in new scenarios in life.  I

4    believe that God has a plan for you.  He has not cast you aside

5    or condemned you outright.  Please consider the ways that you

6    can turn your perspective around.  Experience true repentance

7    and walk freely as a man redeemed.

8         "I don't wish you pain.  I don't wish you sorrow.  I only

9    ask for your assistance in putting the light back in so many

10   broken little girls' eyes.  Help put an end to child

11   pornography.  You have more impact than you know.

12        "Sincerely, Vicky's husband."

13        Third, as I noted earlier, victim S.H. is present in the

14   courtroom, and she has advised me that she would like to make a

15   statement.

16             THE COURT:  Please.

17             MS. CHOU:  I can have her come up to counsel table.

18             THE COURT:  We can take a short recess if she would

19   like a short recess before we start.

20             MS. CHOU:  Yes, Your Honor, could we please do that?

21             THE COURT:  Yes.

22             THE COURTROOM DEPUTY:  The Court's in recess.

23        (Recess taken from 10:32 a.m. to 10:46 a.m.)

24             THE COURT:  We are back on United States versus

25   Larssen.  We have the defendant present, and we have all

```
 1    counsel present, and then we have the victim present.
 2              MS. CHOU:  Yes, Your Honor.  So victim S.H. would
 3    like to make a statement.
 4              THE COURT:  Yes.
 5       And feel free to remain seated.  You can stand up,
 6    wherever you're comfortable.  If you want to remain there in
 7    your chair, feel free.
 8              VICTIM S.H.:  So I have been affected by these
 9    crimes.  I've already watched my mom and wonder where she
10    screwed up, not listening to her daughter at such a young age,
11    gotten into a certain mindset involved with so many men,
12    thinking she taught me the things I knew, and then now all the
13    people I was involved with.
14       My mother, the first time she found out that I was having
15    sex with older men, to pretty much almost successfully
16    committing suicide, when she asked me why I did the things I
17    did, I said to be a good girl, which I don't think she
18    remembers, and I hope she doesn't.  "Good girls" is something
19    that Curtis and the other men he encouraged me to talk to would
20    say when referring to young girls having any sexual contact,
21    really, with older men or family members.
22       I want you to learn something about myself.  I want to
23    make people happy and happy with me.  I feel like this is how I
24    became so diverted to Curtis for a few years.  I have an
25    intense fear of hurting people, and I don't know if he knew
```

that when he crossed me that day on Teen Spot or just really
lucked out.  I was online school during 7th and 8th grade and
would be home alone all day.  I got lonely and went to chat
rooms to talk with people, and this is where I met Curtis, or
Calib as I grew up knowing.  We talked almost every day through
these two years.

Two years we talked.  And he made it seem like kids that
were my age at the time were having sex with older men.  Two
years to make me feel like I should be jealous of girls who
were being sexually abused by older men or family members,
except the word "abused" was never used.  It was always
something along the lines of "lucky enough."

We started fizzling out once I entered high school and
actually went to a building school.  I suspect we likely
fizzled out for many reasons:  one being I was not online very
much; and two, I started realizing these sexual things that I
grew up knowing weren't actually things of the norm; and three,
likely I was getting too old for his taste, being too old,
something I felt more to these men.

And another way I got trapped in the mindset and would
have done a lot for Curtis -- actually, I don't think you
realize how much a hold he had on me.  I met Curtis when I was
curious about sex and how things worked.  I had questions; he
had answers.  He made childish things seem attractive.

I remember the first time I chatted with him lying on my

1    bed staring at the ceiling, and I kept getting distracted from
2    my conversation by whatever cartoon was on the TV, and I kept
3    apologizing.  Then he would reassure me, say, "Oh, it's no
4    problem.  I find that kind of thing hot."  He didn't make me
5    feel bad or told me that what I was going through was not the
6    norm when I started to gain developmental -- normal
7    developmental things socially and pubertywise.  He gained my
8    trust because when I went out to meet men, he would tell me men
9    were liars or too sketchy.  But for every sketchy man he would
10   prevent me from meeting, he would encourage two more.  He would
11   tell me what he would like to see me sleep with, and we would
12   find them.
13       When I said, "I found a partner," he would ask me so many
14   questions about them like a parent would to their daughter when
15   they get a new boyfriend or girlfriend.  He wanted me to
16   message him before I left and when I got back, but he got me
17   hooked since nothing ever seemed good enough.  He would tell me
18   what he wants.  He would say, "I want you to be with someone
19   older," and I would get older, and he would tell me, "Oh, that
20   wasn't good enough.  That guy is too disgusting.  That guy is
21   not what you deserve or what you should be with."
22       We would -- he kept me hooked by saying that he would come
23   over if I showed effort.  We would stay up late and plan where
24   to stay and everything.  For two years the majority of what I
25   did was focused around him.  I've looked back at photos from

1   times and I can remember conversations or what was going on

2   then.  So many fellow peers I had put off by doing what he told

3   me were normal and so many opportunities I didn't take because

4   he would tell me not to or I would not be able to talk to him

5   if I took them.

6       I can't properly format all the ways he has affected me

7   because I'm still discovering them.  I fear one, though, I fear

8   to have a family due to him.  He made me fear that the majority

9   of men out there, especially ones drawn to me, want to sexually

10  abuse their daughters.  When I was pregnant, I had an abortion.

11      One reason I had an abortion over foster care was because

12  I had all these men offering to take me and my child in if it

13  was a girl just to use us, more so her.  And I didn't want to

14  place the child in foster care because this seemed to be where

15  the men, they seemed to get long-term daughters to abuse.

16      I was fearful that the majority of men wanted to sexually

17  abuse their kids.  This fear is like -- Curtis would make it

18  seem like the norm and was common.  It came from talking to

19  these men who had daughters yet were having sex with me or

20  talking to me about having sex.

21      When I started to learn that this wasn't as normal,

22  through social interactions with kids my age, Curtis and other

23  men started justifying it by me continuing to sleep with men,

24  by telling me once they had fucked me and I stopped, that they

25  will have had tasted like blood -- like a shark has had blood

1   and want to go for the kids.  So he put me in fear that if I

2   cut off ties with these men, they would go for the kids.  So it

3   continued for a bit longer until Curtis started coming online

4   less and I started to find my way out.  I'm always going to be

5   affected by this, but some days more than others.

6            THE COURT:  Thank you very much.

7            MS. CHOU:  The Government's recommendation is 14

8   years.  Now it's at the low end of the guidelines range that

9   has been calculated by both the parties and stipulated in the

10  plea agreement, the second amended plea agreement, and also

11  recommended in the probation office's PSR.  The 14-year

12  sentence is appropriate for the reasons that I have set forth

13  in the Government's sentencing positions.

14       And what I want to say now is in response to the

15  defendant's request for a below-guideline sentence of the

16  mandatory minimum of 10 years.  I am not suggesting to the

17  Court differently from my recommendation that the Court impose

18  a sentence of more than the Government's recommended sentence

19  of 14 years at the low end of the guidelines.

20       Just a couple of things that I want to respond to to what

21  Ms. Hettle noted.  I want to start by saying that I know

22  Ms. Hettle has the utmost respect and care for the victims in

23  this case, and specifically victim S.H.  I do have to disagree,

24  though, with the defense's assessment that the trauma that the

25  defendant endured from his father, which the Government -- I am

1    not attempting to minimize.  In fact, I referenced it

2    repeatedly in the Government's sentencing position, but I can't

3    equate that with being sexually abused the way that the victims

4    of the defendant's conduct both in the child pornography that

5    he possessed and also the sexual abuse that the victim S.H.

6    endured as a result of the defendant's offense, I cannot equate

7    those two.

8         There was a distinct difference in what was happening in

9    that the defendant was directing -- the defendant in his late

10   20s, was directing a teenager who was 12 or 13 years old to go

11   out and actively have physical sexual contact with adult men,

12   and she did at his direction.  And he directed her to take

13   pictures or videos of it, and she did at his direction.

14        She is 13 years old.  There is a difference when it is a

15   minor victim that is being directed by an older offender.  It's

16   called grooming.  There is a term for it when the older abuser

17   grooms the victim in preparation for actual physical sexual

18   conduct, and that is what this defendant did.

19        Ms. Hettle described him as a first-time -- that this is

20   his first offense; he is a first-time offender.  The Government

21   agrees that he has otherwise been law-abiding insofar as he has

22   no other criminal history points, but as the Government has

23   noted, and again this is why the Government does not agree to

24   the request to depart from the guidelines, this is not the

25   defendant's only offense, and this is not the defendant's only

1   victim.

2        The chat session logs that the Government submitted to the

3   Court with its first sentencing position demonstrates that the

4   defendant did not restrict his activity to just victim S.H. or

5   to the pornography files -- child pornography files that he

6   possessed, but that he was actively trying to engage in other

7   chat sessions with other people he believed -- based on his

8   questions, "How old are you?" "Where do you go to school?" he

9   believed that these were minor females.  And his only objective

10  in contacting those victims was sexual gratification for more

11  grooming and to try to get them to send him more pictures of

12  themselves, that is, to have them create child pornography of

13  themselves to send to him.

14       For that reason, again, the Government does not believe

15  that a below-guideline sentence is appropriate and that a

16  sentence of 14 years is appropriate taking into account the

17  nature and circumstances of the offense.

18       The question about whether or not the defendant's conduct

19  was limited to the Internet, I also want to just address

20  briefly, which is that, as I'm sure the Court has seen, and I

21  know Ms. Hettle and I have seen a lot of cases, are truly

22  restricted to the Internet, either just possession of child

23  pornography files or distribution, where the sharing of those

24  files or the chats, where there's an attempt to reach out to

25  people who the defendant believed, but never had reason to know

```
 1    for sure, were minor victims.
 2         And this case is different because there was a minor
 3    victim who the defendant did direct to have sex with an adult
 4    male or have sexual contact with an adult male, so there was
 5    actual physical sexual contact that resulted from the
 6    defendant's offense.  Again, a below-guideline sentence is not
 7    appropriate where you have a defendant who is directing a
 8    person who he knows is a real teenage girl, who is susceptible
 9    to his direction, and saying things to her like, "Go meet these
10    men," and "Tell them you want to be raped."  And that's, in
11    fact, what happened because when she met with those men,
12    whether or not it was consensual, she was a teenager at the
13    time, and it was statutory rape.
14         I'm not minimizing, again, the trauma and the abuse that
15    the defendant suffered at the hands of his father and brother.
16    As I noted in the Government's sentencing position, that kind
17    of treatment toward a young adult is awful.  It is awful, but
18    again, I can't equate it to the treatment of the victims that
19    is apparent in the child pornography files and the videos and
20    also what it is that he had the victim endure.
21         It doesn't matter that the victim appeared to be
22    consensual at the time.  The victim was 13 years old, or
23    thereabouts, and there is a difference.  And the law recognizes
24    that somebody who is that developmentally immature, who is
25    susceptible to the grooming and directions of somebody, who, as
```

1   S.H. just herself mentioned, that she valued and wanted to make

2   happy and was willing to do these things to maintain his

3   approval.  I mean, this is the classic power dynamic of a

4   grooming relationship, and the grooming, of course, reached the

5   actual physical sexual conduct.

6        The 14-year sentence that the Government recommended,

7   again, is at the low end of the guidelines range.  And as I

8   noted in the sentencing position, taking all things into

9   consideration, the aggravating circumstances, the effect upon

10  the victim, the potential harm on society, and all of the

11  mitigating circumstances, of which there are many -- and the

12  Government, again, doesn't minimize those at all -- the 14-year

13  sentence is an appropriate sentence.  It is a sentence that

14  would be consistent with sentences that similarly situated

15  defendants across the country would be subjected to because it

16  is not just within the guidelines, but actually at the low end

17  of the guidelines.

18       The last thing I want to mention to the Court, as the

19  Government mentioned at the beginning of this hearing, the

20  Government learned late Friday/early this morning that the

21  Crime Victim Compensation Program, the CVC, has agreed to fund

22  S.H.'s counseling sessions.  And we've confirmed with the

23  counseling hospital that they will be charging the CVC a

24  hundred dollars for each of 20 sessions, that the amount of the

25  counseling for S.H. will be $2,000.

1          I would ask the Court to order that the defendant,

2     therefore, pay restitution, and this is in addition to the

3     restitution that he's stipulated to for the four victims of the

4     child pornography crimes that was contained at Exhibit H that

5     was attached to the Government's supplemental sentencing

6     position.

7          In addition to that, I would ask the Court to order that

8     the defendant pay restitution in the amount of $2,000 to the

9     Crime Victim Compensation Program at P.O. Box 44835, Olympia,

10    Washington 98504-4520.  The victim claim number is number

11    VN64074, and that should be included in payments.  And I will

12    submit something when I return to the office that has that

13    information contained.

14         I also want to add or ask the Court to order that -- well,

15    let me back up.  As I noted at the beginning of the hearing, I

16    think when Ms. Hettle brought it up, the adult male with whom

17    the victim S.H. met for sexual contact at the direction of the

18    defendant is currently pending -- he's been charged federally

19    in the Western District of Washington in Seattle, and that case

20    is pending.

21         So I would ask the Court to order that if that

22    defendant -- and that is in the case of United States versus

23    Steven, S-t-e-v-e-n, Rigtrup, R i-g-t-r-u-p, in case number

24    CR 17-134, in -- I think it's in the Western District of

25    Washington, but the district that Seattle is in.  Should that

1    defendant ultimately be ordered by the district court in that

2    case to pay restitution to victim S.H. in conjunction with this

3    conduct, that the Court then order Defendant Larssen to be

4    jointly and severally liable for that restitution along with

5    the defendant in Washington state.

6              THE COURT:  I think that's probably best handled by

7    the judge in Washington.

8              MS. CHOU:  Your Honor, we would also have the AUSA

9    there order that the defendant in Washington be jointly and

10   severally liable, but in order for that joint and several

11   liability to apply also to this defendant, we would ask for

12   that conditional language to be put in the restitution order.

13   That's probably the easiest way of making sure that if and when

14   that defendant is ordered to pay restitution to victim S.H.,

15   that the restitution would be jointly and severally liable

16   here.  And I will notify the Court if and when that order comes

17   down from Washington state.

18             MS. HETTLE:  Your Honor, we are asking for that

19   conditional statement as well to be part of the JNC.

20             MS. CHOU:  So unless the Court has any other

21   questions for me, I will submit on the recommendation set forth

22   in the position papers, which is the low-end guideline sentence

23   of 14 years, or 168 months.

24             MS. HETTLE:  Your Honor, can I respond briefly?

25             THE COURT:  Yes, please.

1            MS. HETTLE:  And I think it's important not just for

2     the Court, but for victim S.H. as well, to clarify.  I was

3     making a general statement about trauma, Your Honor, and the

4     damaging effects of trauma, and my client crossed the line with

5     his conduct in this case and behaved abusively.  I am not

6     equating that with anything that the victim has done here.  And

7     it's important, Your Honor.

8          What I'm saying, though, is, and I think that the victim

9     said in her statement, that the repercussions of the abuse are

10    to be believed, to have uncertainty with yourself, to believe

11    you're less worthy.  And in the chats between my client and the

12    victim, she did indicate that she was a victim of sexual

13    abuse -- and I hope I'm getting this right -- before -- before

14    she, I think, even came on to Teen Spot.

15         And her self-worth was shaky, Your Honor, just as my

16    client hurt from his childhood, shaky self-worth -- more than

17    shaky self-worth.  He really feels like he was abused,

18    Your Honor, that he was not worthy as a person; he was not

19    worthy as a man; he was not a man.  He was not -- he did not

20    have his father's -- not only his father's approval, his father

21    condemned him as an individual.

22         And when he was exploring as a sexual youngster, he

23    couldn't walk ahead as normal children with those kinds of

24    relationships, with any ability that -- he could have any

25    ability that he was knowing where he was going.  And

1    unfortunately, that part of him was sublimated, Your Honor.  It

2    didn't get expressed.  He didn't get to get it out and get

3    help, so it manifested itself later in life.

4        I did not mean to diminish in any way what S.H. has gone

5    through, Your Honor, of any abuse that she has suffered at the

6    hands of my client or not.  All I'm trying to say is the lack

7    of physical conduct here and that it was all done over the

8    Internet helps to control -- may help to control this situation

9    when it comes to supervision because he seems to be a person

10   who operates online, not that that doesn't have damaging

11   effects, just I think it's easier to control when somebody

12   doesn't show the proclivity to make physical contact.

13       And on that, Your Honor, I would submit.

14           THE COURT:  Okay.  Before I take the statement of

15   the defendant, Larssen, I just have a couple of questions for

16   Ms. Chou, and that is having to do with restitution.  So

17   there's a request for 1,000 for each of the victims in the

18   "Vicky," "Sierra," "Pia" and "Sarah," S-a-r-a-h, series; is

19   that correct?

20           MS. CHOU:  Correct, Your Honor.

21           THE COURT:  And then is there a request for order of

22   restitution for S.H.?

23           MS. CHOU:  There is not a written request as to the

24   amount that I just noted on the record.  I did make that

25   request in the Government's second sentencing position paper.

1    It was --

2            THE COURT:  So what sum -- I understand that there's

3    a request for restitution in the sum of 2,000 to the Victim

4    Compensation Program.

5            MS. CHOU:  Yes.

6            THE COURT:  But separate and apart from that, is

7    there a request for restitution for S.H.?

8            MS. CHOU:  No, Your Honor, and let me just clarify.

9    That is due to the fact that we just confirmed that the CVC is

10   going to be paying for S.H.'s counseling, and so, therefore,

11   the restitution goes to the CVC.  Had the CVC not approved her

12   request for funding, we would ask that the money go directly to

13   S.H., but because they are going to pay the counseling for her,

14   restitution then should go to compensate that fund to make them

15   whole.

16           THE COURT:  And then in reference to the cost of her

17   transportation down here, have those costs been covered by the

18   Government?

19           MS. CHOU:  They have, Your Honor.

20           THE COURT:  So transportation and --

21           MS. CHOU:  Housing.

22           THE COURT:  -- housing?

23           MS. CHOU:  Yes, Your Honor.

24           THE COURT:  And there's -- it seems likely to the

25   Court that separate and apart from the counseling that S.H.

1   will receive from -- through the Victim Compensation Program,

2   that she would need long-term counseling thereafter.

3          MS. CHOU:  Your Honor, the initial assessment that

4   the counseling service provider conducted indicated that they

5   thought a 20-session counseling, I guess, session or plan was

6   appropriate at this time, but under 355 -- I want to make sure

7   I quote the restitution statute correctly.  Under 3664 and

8   3572, that if the Government learns of additional restitution

9   requests after sentencing, that the Government will submit

10  those additional restitution requests to the Court and,

11  obviously, also notify defendant.

12      So in any event, that after the 20 sessions if the service

13  provider and S.H. choose to continue counseling and it goes

14  above and beyond the $2,000, that the Court would order

15  restitution now, that information will be submitted by the

16  Government to the Court and also whether or not it would be,

17  again, paid by the Crime Victim Compensation Program, so that

18  any restitution would go to them, or if the circumstances are

19  changed and the defendant either at that point is paying

20  herself or -- sorry, not the defendant, the victim is either

21  paying herself or through insurance, which she does not have at

22  this time.

23          THE COURT:  And then, Mr. Larssen, now is your time

24  to make a statement, if you wish to make a statement.

25          THE DEFENDANT:  First, I want to -- I want to

1    apologize for all of this.  I want to apologize first to my

2    mom.  She's probably been the greatest person that ever -- you

3    know, that I was ever blessed with, and she has to sit here and

4    see her son, you know, in handcuffs.  I allowed my childhood

5    trauma and my abuse to not only affect myself by allowing me to

6    lose everything, friends, family, freedom, but worst of all, I

7    affected two people behind me.

8         I'm not a -- I became a failure not only to myself, but to

9    my mom, you know.  She -- she -- you know, parents raise you to

10   do the best that they can.  They raise you to live a good life

11   and get married and have kids, and she will never get to see

12   that from me, you know.  She gets to visit me in handcuffs.

13   But worst of all, I affected my victim.

14        I grew up feeling horrible about myself, and I swore to

15   myself that I would never cause any harm to somebody else like

16   I felt, but here I sit, causing the same kind of harm that was

17   done to me.  It breaks my heart, and it's something that I'm

18   going to have to look for forgiveness for the rest of my life.

19   I don't expect anyone to forgive me.  I hope one day that they

20   will, but I sincerely apologize to the Court and to my victim

21   and to my mother for the harm that I have caused.  And whatever

22   sentence I'm going to get, I'm going to leave this place a

23   better person than I came in.

24        That's all.  Thank you for giving me the opportunity to

25   speak, Your Honor.

1          THE COURT:  Thank you.

2      Anything further?

3          MS. HETTLE:  Nothing further, Your Honor.

4          THE COURT:  Ms. Chou?

5          MS. CHOU:  No, Your Honor.

6          THE COURT:  So in reference to the orders of

7  restitution and the other requests from the Government

8  concerning findings of victims of criminal conduct, just follow

9  along, and if there's any suggested correction, then let's make

10 sure it's covered on the record.

11     So from the Court's point of view or perspective here, the

12 request for a sentence of 120 months and the request for a

13 sentence of 14 years fails to capture the harm that was caused

14 by this defendant on the victim S.H.  It's pretty clear that 20

15 sessions of counseling are not going to be able to correct all

16 of the trauma that S.H. has suffered.  It's going to be

17 lifelong.  It's going to be intermittent.

18     There will be times where she will need counseling in the

19 future separate and apart from the 20 sessions.  There will be

20 times where the conduct caused by the defendant, Mr. Larssen,

21 will reinsert itself in her life.  And I recognize that it's

22 going to be a difficult road for S.H., and so the 14 years does

23 not capture all of the harm that he has caused her.

24     Separate and apart from that, it is clear to the Court

25 that Mr. Larssen is a sexual predator.  So not only did he prey

1    upon the victim here, S.H., but it's clear from all of the

2    other information and evidence provided by the Government that

3    he attempted to do the same with other vulnerable adolescents.

4    And it's pretty clear that he would have continued the conduct

5    but for the fact that the Government has prosecuted him in this

6    case.

7         And then separate and apart from all of the conduct and

8    harm caused to S.H., we have the issue of the child pornography

9    and the number of videos that he had in his possession.  And

10   then the conduct that occurred pretrial while he was on

11   pretrial release, he was in possession of pornography.  I'm not

12   assuming it's child pornography, I cannot do that, but he was

13   in possession of pornography, would suggest that he is not a

14   compliant individual and is going to need lifelong supervision.

15        So the Court, taking all of these factors into

16   consideration, would impose the following sentence:  First of

17   all, the Court would adopt the findings and conclusions in the

18   PSR regarding the total offense level and criminal history

19   category.  The offense level is 35, Criminal History Category

20   is I.  The guideline range is 168 to 210 months.

21        The defendant shall pay a special assessment of $100 due

22   immediately.  Any unpaid balance shall be paid during the

23   period of imprisonment at the rate of not less than $25 per

24   quarter and pursuant to the Bureau of Prisons' Inmate Financial

25   Responsibility Program.

1    It is ordered that the defendant shall pay restitution,

2  and restitution is ordered in the sum -- it would be in the sum

3  of, looks like, $6,000 as follows and pursuant to Title 18

4  U.S.C. 2259:  Restitution shall be paid to the victim in the

5  "Vicky" series in the sum of $1,000 payable to Carol L.

6  Hepburn, H-e-p-b-u-r-n, in trust for Vicky, 200 1st Avenue,

7  Suite 550, Seattle, Washington 98119-4203; $1,000 to the victim

8  in the "Sierra" series, that's S-i-e-r-r-a, payable, again, to

9  Carol L. Hepburn, in trust for Sierra, same address as

10  previously referenced; $1,000 restitution to victim Pia in the

11  "Pia" series, payable to Carol L. Hepburn, in trust for Pia,

12  same address; and then $1,000 payable to victim Sarah in the

13  "Sarah" series, and that's S-a-r-a-h, same -- it's Carol L.

14  Hepburn, in trust for Sarah, at the same address as previously

15  referenced.

16         MS. CHOU:  Just a brief correction, Your Honor.

17         THE COURT:  Yes.

18         MS. CHOU:  It's victim Sarah in the "Marineland"

19  series.

20         THE COURT:  In which series?  Oh, the "Marineland"

21  series.  I'm sorry.

22         MS. CHOU:  The series names don't necessarily

23  correspond with the victims.

24         THE COURT:  Again, the last order is Sarah, payments

25  of restitution of $1,000 to Sarah in the "Marineland" Sarah

1    series, $1,000.  And then $2,000 payable to the Victim

2    Compensation Program.  The address is, make sure I'm correct

3    here, P.O. Box 44835, Olympia, Washington 98504-4520, claim

4    number VN64074.

5        The Court would also find that the defendant should be

6    held jointly and severally liable with the -- assuming

7    conviction in the following case, with defendant Steven

8    Rigtrup, R-i-g-t-r-u-p, in case number CR 17-134 WVW, that's in

9    the Western District of Washington, for the sum ordered to the

10   Victim Compensation Program, and that would be the $2,000.  The

11   Court would order that if the defendant makes partial payment,

12   each payee shall receive approximately proportional payment.

13       The Court finds, from a consideration of the record, that

14   the defendant's economic circumstances allow for restitution

15   payments pursuant to the following schedule:  A partial payment

16   of $3,500 shall be paid immediately.  The balance shall be due

17   during the period of imprisonment at the rate of not less than

18   $25 her quarter and pursuant to the Bureau of Prisons' Inmate

19   Financial Responsibility Program.

20       If any amount of restitution remains unpaid after release,

21   monthly payments of at least $50 shall be made during the

22   period of supervised release.  The payments shall commence 30

23   days after commencement of supervision.  Interest would be

24   waived pursuant to 3612(f)(3)(A) Title 18 because the defendant

25   will not have the ability to pay interest.

1    Fines are waived in light of the significant term of

2    imprisonment that will be imposed.  He will not have the

3    ability to pay a fine.

4    The Court would also impose the following order:  Pursuant

5    to the Sentencing Reform Act of 1984, it is the judgment of the

6    Court that the defendant, Mr. Curtis Larssen, is committed on

7    Count One of the first superseding information to the custody

8    of Bureau of Prisons for a term of 204 months.  That's 17

9    years.

10   The Court would recommend in light of all of the

11   information contained in the PSR concerning his mental health,

12   that the Bureau of Prisons conduct a mental health evaluation

13   of the defendant and provide all necessary treatment.

14   Upon release, the defendant shall be placed on supervised

15   release for a term of life under the following terms:  Comply

16   with rules and regulations of the U.S. Probation Office in

17   General Order 05-02; General Order 01-05, including the three

18   special conditions delineated in 01-05; not commit any

19   violation of local, state, federal law or ordinance.

20   During the period of community supervision, the defendant

21   shall pay the special assessment in accordance with the

22   judgment orders of the Court.  The defendant shall cooperate in

23   the collection of a DNA sample.

24   The defendant shall apply all monies received from income

25   tax refunds to the outstanding court-ordered financial

53

1    obligation.  All monies received from tax refunds, lottery

2    winnings, inheritance, judgements and any anticipated or

3    unexpected financial gains shall be paid to the Court-ordered

4    financial obligation.

5        He shall possess only those computers and computer-related

6    devices, screen user names, passwords, e-mail accounts and

7    Internet service providers that have been disclosed to the

8    probation officer upon commencement of supervision.  Any

9    changes or additions are to be disclosed to the probation

10   officer prior to the first use.

11       Computer and computer-related devices include personal

12   computers; personal data assistants, PDAs; Internet appliances;

13   Internet games; cellular telephone; digital storage media; as

14   well as peripheral equipment that can be accessed or modified

15   to be accessed; electronic bulletin boards or other computers.

16       All computer, computer-related devices, and their

17   peripheral equipment used by the defendant shall be subject to

18   search and seizure.  This shall not apply to items used at the

19   defendant's employment site, which are maintained and monitored

20   by an employer, an employer separate and apart from the

21   defendant in this case, should be defendant employee, or be the

22   owner of a business or employed himself.

23       The defendant shall comply with rules and regulations of

24   the computer monitoring program, shall pay the cost of that

25   monitoring program in an amount not to exceed $32 per month or

1    per device connected to the Internet.

2         He shall register as a sex offender and shall keep the

3    registration current in each jurisdiction where he resides,

4    where he is an employee, and where he is a student, to the

5    extent that the registration procedures have been established

6    in each jurisdiction.  When registering for the first time, the

7    defendant shall also register in the jurisdiction in which the

8    conviction occurred, if different from his jurisdiction of

9    residence.  The defendant shall provide proof of registration

10   to the probation officer within 45 days of his release from

11   imprisonment.

12        The defendant shall participate in psychological

13   counseling or psychiatric treatment or a sex offender treatment

14   program as approved and directed by the probation officer,

15   abide by rules and requirements of the program.  The probation

16   officer shall disclose the presentence report or any previous

17   mental health evaluations to the treatment provider.

18        The defendant shall not view or possess any materials,

19   including pictures, photographs, books, writings, drawings,

20   videos, video games, depicting or describing child pornography

21   as defined in Title 18 U.S.C. Section 2256(8), or sexually

22   explicit conduct as defined in Title 18 2256(2).  This

23   condition does not prohibit the defendant from possessing

24   materials solely because they are necessary to and used for

25   collateral attack, nor does it prohibit him from possessing

materials prepared and used for the purposes of his

Court-mandated sex offender treatment, which the defendant's

treatment provider or the probation officer has approved, in

reference to possession of the material, in advance.

The defendant shall not own or use the services of any

commercial mail receiving agency, nor shall he open or maintain

a post office box without prior written approval of the

probation officer.  He shall not contact the victim S.H. by any

means, including in person, by mail or electronic means or via

third parties.  Further, he shall remain at least 1,000 yards

from the victim at all times.  If any contact occurs, the

defendant shall immediately leave the area of contact and

report the contact to the probation officer.

He shall not frequent or loiter within direct view of

schoolyards, parks, public swimming pools, playgrounds, youth

centers, video arcade facilities or other places primarily used

by persons under the age of 18.

He shall not associate or have verbal, written, telephonic

or electronic communication with any person under the age of

18, except in the presence of the parent or legal guardian of

said minor and on condition that the defendant notify the

parent or legal guardian of his conviction in the instant case.

This provision does not encompass persons under the age of 18

such as waiters, cashiers, ticket vendors, et cetera, whom the

defendant must interact with in order to obtain ordinary or

1    usual commercial services.  He shall not affiliate with, own,

2    control, volunteer or be employed in any capacity by any

3    business or organization that causes him to be in contact with

4    persons under the age of 18.

5         He shall not affiliate with, own, control or be employed

6    in any capacity by a business whose principal conduct is

7    production or selling materials depicting or describing

8    sexually explicit conduct as defined in Title 18 2256.  The

9    defendant's employment shall be approved by the probation

10   officer, and any change in employment must be preapproved by

11   the probation officer.  He shall submit the name and address of

12   the proposed employer to the probation officer at least 30 days

13   prior to any scheduled change.

14        He shall not reside within direct view of schoolyards,

15   parks, public swimming pools, playgrounds youth centers, video

16   arcade facilities or other places primarily used by persons

17   under the age of 18.  The defendant's residence shall be

18   approved by the probation officer, and any change in residence

19   must be preapproved by the probation officer.  He shall submit

20   the address of the proposed residence to the probation officer

21   at least 10 days prior.

22        He shall submit to a search at any time, with or without

23   warrant, by any law enforcement or probation officer of his

24   person, property, house, residence, vehicle, papers, computer,

25   other electronic communication or data storage devices, media

and effects upon reasonable suspicion concerning a violation of
a condition of supervision or unlawful conduct by the defendant
in the lawful charge of the probation officer's functions.

The Court would authorize the probation officer to
disclose the presentence investigation report and previous
health evaluation reports to the treatment provider.  The
treatment provider may provide information, excluding the
presentence report, to local or state service agencies for the
purpose of the defendant's rehabilitation.

In sentencing the defendant, the Court has taken into
consideration that the defendant engaged in a long-term
relationship with victim S.H.  The relationship included having
S.H. engage in various sexual activity on the webcam for
Larssen to watch, take sexually explicit photographs and videos
of herself to send to Mr. Larssen, and to meet and solicit many
other men for sexual activity that Larssen directed to either
show him live on the webcam and/or to film or photograph to
send to him.

The Court has taken into consideration Larssen's abusive
behavior with the victim is separate and apart from the sexual
conduct.  Mr. Larssen, according to the information received by
the Court, would berate the victim if she did not comply.  And
then at least one image of the victim engaging in sexual acts
was sent to Mr. Larssen via e-mail.

Separate and apart from the conduct involving S.H.,

1    Mr. Larssen also used a peer-to-peer file sharing program to

2    download, receive, share and distribute child pornography with

3    others, including law enforcement agents working in an

4    undercover capacity.  And pursuant to the search warrant

5    previously mentioned, the Court determined that he had

6    possessed at least 470 videos and 2 image files containing

7    child pornography.

8         The Court, as part of the sentencing and commitment order,

9    would order the clerk to include that the Court has -- and

10   pursuant to the stipulation of defendant, that the Court has

11   determined that victim H. from the "Balletgirl" series; victim

12   K.Y. from the "Dalmatian" series; victim Sierra, S-i-e-r-r-a,

13   from the "Jan Socks" series; victim Sarah, S-a-r-a-h, from the

14   "Marineland" series; victim Pia from the "Sweet Sugar" series;

15   and the victims from "Tara," "Jenny," "Hawaiian Purple" and

16   "Vicky" series are victims of his criminal conduct.  The Court

17   would also conclude and find that these victims, as well as

18   victim S.H., are the victims of the defendant's criminal

19   conduct.

20        The Court would advise the defendant of his right to

21   appeal his sentence imposed by the Court if counsel and

22   defendant believe that the sentence is contrary to law or

23   contrary to any stipulations in the plea agreement.

24        You have to discuss that with Ms. Hettle.

25        Any notice of appeal must be filed within 14 days from

1    today's date.

2         The Court would recommend that the defendant be housed at

3    a facility that would ensure his protection and security from

4    other defendants who would be inclined to cause harm.  He

5    should be housed at a facility that can address the serious

6    psychological and emotional issues that the defendant suffers

7    from.

8         And if you have a recommendation, Ms. Hettle, I would

9    certainly --

10            MS. HETTLE:  I think it's Englewood, Colorado,

11   Your Honor, that specializes in these types of cases and is

12   going to be near where his mother will be located.

13            THE COURT:  I didn't get the name.

14            MS. HETTLE:  Englewood, Colorado.  We can just say a

15   facility in Colorado, Your Honor.

16            THE COURT:  If it is a facility that treats this

17   type of condition.

18            MS. HETTLE:  Yes, it is.

19            THE COURT:  Then the Court would recommend

20   Englewood, Colorado or another similar facility in Colorado so

21   he can maintain a visiting relationship with his mother.

22            MS. HETTLE:  Thank you, Your Honor.

23            THE COURT:  Thank you.

24         Any corrections, Ms. Chou?

25            MS. CHOU:  A couple of questions about the

60

1    conditions of supervised release.  The parties did stipulate to

2    a number of the conditions in the plea agreement.  Most of them

3    were captured in the Court's recitation.  There were just a

4    couple I wanted to point out.

5              THE COURT:  Let me find it.

6              MS. CHOU:  They are beginning at page 4 of the

7    second amended plea agreement.

8              THE COURT:  One second.

9         What condition?

10             MS. CHOU:  Actually, going back to page 3.

11             THE COURT:  Could you give me condition number?

12             MS. CHOU:  Yes.  I don't remember the condition

13   number that the Court had in its list, but in the plea

14   agreement, condition number "i," that is little Roman numeral

15   "i," the parties had agreed that defendant would provide proof

16   of registration.  And I'm at line 17, line 18 of the plea

17   agreement, on page 3.  That the proof of registration would be

18   provided to probation within 3 days of his placement on

19   supervised release.

20             THE COURT:  Yes, and I recognize that that was part

21   of the stipulation.  I changed it to 45 days because as a

22   practical matter, the defendant is going to be incarcerated for

23   a significant period of time.  There will be much transition in

24   his life when he is released from prison, and taking care of

25   this type of registration, which has significant consequences

1    if he fails to comply, it seems to the Court that he should

2    have more time to accomplish that.

3              MS. CHOU:  Your Honor, could I just have a brief

4    moment to confer with the probation officer?

5              THE COURT:  Yes.

6         (Discussion off the record.)

7              MS. CHOU:  Next, Your Honor, on page 4 of the plea

8    agreement, condition "v," the Government would ask the Court to

9    include that defendant shall not contact victim S.H. or any of

10   the other victims that the Court has noted.

11             THE COURT:  Okay.  The Court would modify its

12   sentencing order and to include any of the other victims that

13   have been referenced.

14             MS. CHOU:  Finally, Your Honor, the parties did

15   stipulate at condition -- what is this -- "xvii," which is on

16   page 7, that defendant's payment of any outstanding restitution

17   would be made a condition of his supervised release as well.

18             THE COURT:  I thought I accomplished that, that he

19   is to pay restitution during his supervised release consistent

20   with the orders of the Court.

21             MS. CHOU:  So the Court is ordering that his

22   payments of restitution, per the Court's payment schedule, be a

23   condition of supervised release?

24             THE COURT:  Yes.  Let me just -- it would be ordered

25   by the Court if any amount of restitution remains unpaid after

1    his release, that the defendant be ordered to pay a minimum of

2    $100 a month, or 10 percent of his annual income, whichever is

3    greater, to the court-ordered restitution, and that will

4    commence 30 days after he starts supervised release.

5              MS. CHOU:  Your Honor, does that amend the Court's

6    previous order of payment of $50 per month while on supervised

7    release?

8              THE COURT:  It does.

9              MS. CHOU:  And that is a condition of supervised

10   release that the Court is imposing as well?

11             THE COURT:  That is a condition of supervised

12   release.

13             MS. CHOU:  Next, I was just reminded by the

14   probation officer that at paragraph 105 of the revised

15   presentence report, that there is a mandatory $5,000 special

16   assessment that applies under 18 U.S.C. Section 3014 to this

17   category of offense, and that that is to be paid after the

18   defendant has satisfied any other victim-related orders,

19   restitution orders.

20             THE COURT:  I think you're correct.  That is, I

21   think, a new requirement under Title 18 3014.  So the Court

22   would order that the defendant pay to the United States an

23   additional special assessment, separate and apart from the $100

24   previously imposed, in the sum of $5,000.  The payment shall

25   commence after the defendant has satisfied all outstanding

1    court-ordered fines, orders of restitution, and then the other

2    victim compensation obligations pursuant to Title 18 U.S.C.

3    3014.

4          MS. HETTLE:  Your Honor, may I have a moment with

5    the probation officer?

6        (Discussion off the record.)

7          MS. HETTLE:  Your Honor, the special -- if I could

8    have a moment.  That special assessment, according to the

9    probation officer, she believes came into effect two years ago.

10         THE PROBATION OFFICER:  I don't know the exact date.

11   I know it's been --

12         THE COURT:  We are on the record.  So if you want to

13   confer, feel free.

14         MS. HETTLE:  I did, Your Honor.  She feels that

15   amendment happened two years ago.  His conduct predates --

16   predates that, Your Honor, so I think we might have an ex post

17   facto problem with the mandatory special assessment.  And I'm

18   sorry I didn't pick up on that before now, Your Honor.

19         THE COURT:  Well, I'll just leave it up to counsel

20   to resolve.  I mean, it hasn't been referenced in any of the

21   pleadings or briefs, so I'm not sure what the response would

22   be.  I would think that there would not be an ex post facto

23   issue, but --

24         MS. HETTLE:  His conduct occurred in 2014,

25   Your Honor, so -- I could see if I can find the effective

1  date -- does the Court have a code book, Your Honor, to see

2  when that came into effect?  I think that any -- that that is a

3  punishment --

4          THE COURT:  Why don't you confer with Ms. Chou and

5  you can resolve it off the record so we are not having all this

6  placed on the record.

7          MS. CHOU:  Could I just go ahead with the last two

8  housekeeping matters and we can come back as needed?

9          THE COURT:  Yes.

10          MS. CHOU:  All right.  The penalty that I wanted to

11  note is that I just wanted to note that the appeal waiver, as

12  set forth in the plea agreement at paragraph 20, does appear to

13  apply.

14      And finally, the Government moves to dismiss the

15  underlying indictment in this case.

16          THE COURT:  The underlying indictment is dismissed.

17      And I advise Mr. Larssen of his right to appeal.  Again,

18  he has to discuss that with Ms. Hettle and make a determination

19  as to whether there is any remaining grounds to appeal.

20          MS. CHOU:  Yes, Your Honor.

21      If the Court would give Ms. Hettle and me a couple of

22  minutes to confer.

23          (Discussion off the record.)

24          THE COURT:  It looks like it went into effect in

25  2016, and the conduct predates.

1          MS. HETTLE:  Thank you, Your Honor.

2          THE COURT:  So the Government's position?

3          MS. CHOU:  In light of that information, then, it

4    doesn't appear that the special assessment mandatory

5    requirement applies here.

6          THE COURT:  So the Court would strike from the order

7    the order previously made that the defendant shall pay the

8    special assessment of $5,000 pursuant to Title 18 U.S. Code

9    3014 in light of the fact that the law went into effect on

10   January 3rd, 2016.  His conduct ended -- the alleged conduct

11   concluded in 2014.

12       Anything further?

13          MS. HETTLE:  Just one further thing, Your Honor.  He

14   does not have an immediate ability to pay the 500 partial

15   payment in restitution.  His -- that was based on the belief

16   that his mother could sell his car.  The car is not running,

17   and she's having a hard time selling it.  So I would just

18   submit that information to the Court.

19          THE COURT:  Okay.  The order imposed remains.

20       And anything further?  The Court -- the drug testing

21   requirement is imposed.

22          MS. HETTLE:  The two drug tests or drug tests in

23   total, Your Honor?  He doesn't seem to have any drug use that

24   would --

25          THE COURT:  Not to exceed eight tests per month, at

1  least two drug tests.

2          MS. HETTLE:  We would object to that, Your Honor.

3  There is no basis he has any substance abuse problems.

4          THE COURT:  Your objection is noted.

5          MS. HETTLE:  Thank you.

6          THE COURT:  Has bond been previously exonerated?

7          MS. HETTLE:  Your Honor, I don't know if it has, but

8  if the Court would do that, I would appreciate it.

9          THE COURT:  The bond is exonerated.

10          MS. HETTLE:  Thank you.

11          THE COURT:  Thank you.  There's been a lot filed

12  here.  Thank you very much.

13          THE COURTROOM DEPUTY:  The Court is in recess.

14              (Proceedings concluded at 11:50 a.m.)

15                      ---oOo---

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                                  )
4    STATE OF CALIFORNIA      )

5

6               I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  September 28, 2017

17

18

19                         /s/ CAROL JEAN ZURBORG

20                 _____
                   CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21                      Federal Official Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**